Filed 8/11/23  Shenoi v. Maya CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NOEL SHENOI,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>RICHARD MAYA et al.,<br><br>    Defendants and Respondents. | G061235<br><br>(Super. Ct. No. 30-2016-00891570)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Henry J. Josefsberg for Plaintiff and Appellant.

Horvitz & Levy, Felix Shafir, John F. Querio and Jeremy B. Rosen for Defendants and Respondents Richard Maya, West Covina Youth Soccer and California State Soccer Association-South.

Bremer Whyte Brown & O'Meara, Jeremy S. Johnson, Benjamin L. Price and Courtney M. Serrato for Defendants and Respondents Richard Maya and West Covina Youth Soccer.

Grant │Shenon and Adam D.H. Grant for Defendant and Respondent California State Soccer Association-South.

* * *

**INTRODUCTION**

Noel Shenoi appeals from a judgment after a jury trial verdict in favor of West Covina Youth Soccer (WCYS), Richard Maya, and California State Soccer Association – South (Cal-South) (collectively Defendants or Respondents) over an incident at a soccer game at which Shenoi was a referee. Shenoi sued Maya, who coached a West Covina girls' soccer team, for defaming him by stating that he was under the influence of alcohol and smelled of alcohol while refereeing. Shenoi sued Cal-South for doing nothing about these statements, which he claimed breached a contract he had with Cal-South. He sued WCYS and Cal-South for ratifying Maya's conduct. Shenoi also sued all the Defendants for intentional infliction of emotional distress.

The trial court sustained demurrers to all Shenoi's causes of actions except defamation. The case went to a jury, which decided that, while Maya had made the statements without using reasonable care to ascertain their truth or falsity – although without any hatred or ill will toward Shenoi – and without reasonable grounds for believing them, Shenoi had failed to show harm to his property, business, trade, or profession arising from the statements. As the trial court had ruled that the statements were slanderous per quod – that is, required proof of actual damage – Shenoi's failure in this regard resulted in a judgment for Defendants.

Shenoi has appealed on several grounds. He argues that the trial court erred in sustaining demurrers to three of his causes of action. He also faults the court for granting Respondents' motion for a directed verdict on punitive damages and refusing to

2

give a CALCRIM jury instruction on "guilty mind." Mainly he argues that the statements Maya made about him were slanderous per se, not per quod, and therefore he did not have to prove harm to his property, business, trade, or profession arising from the statements.

We affirm the judgment. The trial court ruled correctly that Shenoi had not stated facts sufficient to state causes of action as to the demurrers. The court also ruled correctly regarding the jury instructions, punitive damages, and the nature of the defamation.

## FACTS

As alleged in the operative second amended complaint, Shenoi is certified as a youth soccer referee for Cal-South, which oversees youth soccer in the area. WCYS is affiliated with Cal-South and plays soccer games and tournaments under Cal-South's authority.

Shenoi refereed a WCYS girls under 13 soccer game on December 12, 2015; Maya was the head coach of one team. According to the complaint, Maya told two assistant referees, unidentified third parties, and the mother of one of the players that Shenoi was under the influence of alcohol or smelled of alcohol. The player's mother allegedly notified law enforcement. As the game was ending, deputy sheriffs arrived on the field and, at the conclusion of the game, gave Shenoi a sobriety test.[1] Nothing more occurred at the game.

On December 18, Shenoi e-mailed a WCYS officer to complain about "the West Covina team" calling the police "to allege [he] had been drinking." The officer responded on December 28, having taken a "mini vacation" during the holiday. She promised to contact the coach (Maya) and Shenoi. On January 9, 2016, evidently after an inquiry from the officer, Maya e-mailed a response stating that he thought Shenoi smelled

---

[1] The sobriety test was the "horizontal gaze nystagmus test," during which a person moves a finger from left to right before the subject's eyes to see if there is any tremor. The test lasted a few seconds.

3

of alcohol. He also criticized some of the calls made during the game, but stated that they were "no big deal" and that he told the parents on the sidelines to "relax" about them. Maya stated that the coach of the opposing team told him at the end of the game that he too thought Shenoi smelled of alcohol.

On January 7, 2016, before Maya's e-mail, the coach of the opposing team left a voicemail for the WCYS officer and sent her an e-mail regarding the December 12 game. In the voicemail, he stated, "there's no question at all that [Shenoi] [had] been drinking" and "I could smell alcohol very heavy on his breath[.]" He also stated that he had called the league administrator during the game to tell him about the situation. In his e-mail of the same date, he complained about Shenoi's calls during the first half and stated that when he went to talk to Shenoi about them at halftime, Shenoi "burped and the smell of alcohol was overwhelming." He also stated, "I did not speak with the West Covina coach [Maya] until after the game when he informed me that he had noticed that the referee had been drinking. I told him that I had called our director also because I could smell alcohol on him very heavily."[2]

Shenoi alleged that WCYS forwarded the information to Cal-South, and an insurance claims manager for Cal-South asked Shenoi for a statement. Shenoi alleged that neither WCYS nor Cal-South took any further action.

Shenoi's second amended complaint, naming Maya, Cal-South, and WCYS, alleged causes of action for defamation, breach of implied contract (Cal-South only), breach of contract (Cal-South only), promissory estoppel (Cal-South only), fraud (Cal-South only), and intentional infliction of emotional distress. The allegations against Cal-South alleged a contract between it and Shenoi and that Cal-South breached it by doing nothing to investigate the claim about his being under the influence of alcohol

_____

[2] Shenoi did not sue the coach of the opposing team for defamation.

4

during the game. Shenoi also alleged Cal-South had made a promise to investigate that it had no intention of performing.

The trial court sustained demurrers without leave to amend to the contract-related claims, fraud, and intentional infliction of emotional distress.[3] The defamation claim was tried to a jury beginning on December 7, 2021.

At trial, Maya testified that he smelled alcohol on Shenoi's breath immediately before the game started. Maya voiced his concerns to one of the assistant referees that Shenoi smelled like alcohol. One of the assistant referees testified that he then approached Shenoi and that he did not smell any alcohol or think anything was amiss. The coach of the opposing team testified that he smelled alcohol on Shenoi's breath at halftime.

The jury found that Maya had made the statements about Shenoi's smelling of alcohol and/or appearing to be under the influence of alcohol without reasonable grounds for believing them to be true, without hatred or ill-will toward Shenoi, but without using reasonable care to determine their truth or falsity. Shenoi did not, the jury found, suffer harm to his property, business, profession, or occupation as a result of the statement. Because of this last finding, the jury did not move on to consider any liability for WCYS or Cal-South. Judgment was entered for Defendants on February 1, 2022.

**DISCUSSION**

Shenoi has raised two general issues on appeal: first, the demurrers to the implied contract, promissory estoppel, and fraud causes of action alleged against Cal-South were improperly sustained; and, second, the court made prejudicial rulings during trial regarding evidence and jury instructions.

---

[3] The trial court also denied Defendants' anti-SLAPP motion, and they appealed. (*Shenoi v. Cal. State Soccer Association-South* (June 25, 2018, G055077/G055081) [nonpub. opn.].) We affirmed the order denying the anti-SLAPP motion, agreeing with Shenoi's argument that the speech involved did not implicate a public issue or an issue of public interest regarding the safety of youth in sports. We held, "[W]hile it would certainly be unpleasant and unedifying for a soccer referee to be drunk at a game, it is difficult to see how this situation would pose a danger to the players' *safety*." (*Id.* at p. 7.)

5

## I.          Rulings on Demurrers

"When reviewing a successful demurrer, we accept as true all well-pleaded allegations, however odd or resistant to proof." (*Smith v. Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 627.)  The appellate court independently reviews the complaint for a viable cause of action.  (*Burns v. Neiman Marcus Group, Inc.* (2009) 173 Cal.App.4th 479, 486.)  "[W]e treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

### A.          Implied Contract

On appeal, Shenoi argues that he alleged sufficient facts to establish an implied contract with Cal-South.  The second amended complaint recites excerpts from an unidentified document allegedly authored by Cal-South as well as from Cal-South's code of conduct and rules of play.  Shenoi alleged that these excerpts formed part of a contract with Cal-South in which it promised to investigate allegations of misconduct by referees[4] and Cal-South breached this contract by doing nothing to investigate Maya's charge that Shenoi was under the influence of alcohol at the December 12, 2015, game.

---

[4]          The policy alleged in the second amended complaint is as follows:  "The policy assigns our committee the responsibility and authority to investigate, confirm and adjudicate valid claims of misconduct or conflict of interest by game officials at any sanctioned activity within the jurisdiction of Cal-South.  A referee complaint must fall into one or more of the following categories: [¶] 1.  Misconduct or unethical conduct by a referee during a sanctioned event [¶] 2.  Misuse or abuse of authority during a sanctioned event [¶] * * * * [¶]  The process begins with a written complaint that includes the following:  [¶]  A clear statement of fact defining the misconduct by an official [¶]  A description of the event that includes the date, time and location where the alleged misconduct took place [¶]  The name, address and contact information of the person filing the complaint [¶] * * * * [¶]  The committee will contact the official/officials in question and request copies of their match reports and any other documentation (line up sheets, personal game records or supplemental data) that may be available.  We work closely with the gaming circuits and tournament directors for access to their records as well.  If required, the referee association and the assignor will be asked to supply their input and evaluation of the referee and the event in question. [¶]  The data will be reviewed and we may elect to hold an open hearing to adjudicate the matter.  We also evaluate cause, appropriate disciplinary or remedial action and preventative measures.  Often, conflict resolution can be achieved through a process that includes listening, learning and sharing communication between the parties involved.  [¶]  Remember, never confront a referee on the field. . . ."

Cal-South also has a policy or rule (unspecified which one) covering assault or abuse of a referee.  The second amended complaint alleges no such occurrence.  Therefore nothing obliged Cal-South to hold a hearing on this matter.

6

The trial court sustained Cal-South's demurrer to this cause of action on the ground that the second amended complaint "fails to state facts showing conduct by the parties manifesting a mutual intention to enter into a binding contract. . . . The alleged portions of the Code of Conduct, Referee Complaint Policy, and Prohibitions Against Misconduct Against Referees are not the sort of public notice that constitutes an offer. . . . If a contract existed, it would also bind [Shenoi]. The allegations here would not allow the league to sue [Shenoi] for breach of contract if he violated league policy or failed to serve as a referee."

On appeal, Shenoi analogizes the "offer" that Cal-South allegedly made to an "advertisement," citing several cases. These cases do not support Shenoi's argument.

"[A]n advertisement can constitute an offer, and form the basis of a unilateral contract, if it calls for performance of a specific act without further communication and leaves nothing for further negotiation." (*Harris v. Time, Inc.* (1987) 191 Cal.App.3d 449, 455 (*Harris*).) For example, "If you open this junk mail envelope, you will receive a free calculator watch." (See *id.* at pp. 453, 455-456.) "If you are one of the first three customers to come to our store, you can buy a fur coat for $1.00." (See *Lefkowitz v. Great Minneapolis Surplus Store, Inc.* (1957) 251 Minn. 188, 189, cited in *Harris, supra,* 191 Cal.App.3d at p. 455.) "If you catch influenza after using our medicine, we will reward you." (See *ibid.*) "If you are the highest bidder in an auction of the internet domain name Golf.tv, you get it." (See *Lim v. The.TV Corp. Internat.* (2002) 99 Cal.App.4th 684, 687; see also *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 271-272 (*Donovan*).)

Shenoi alleged no comparable call for the performance of a specific act by Cal-South. Instead he alleged a range of rules and policies, covering many different circumstances. He also alleged no specific act that he performed in response to these rules and policies. He alleged generally that he served as a coach and referee for many years and trained other referees as consideration for all of these policies.

7

Shenoi also cites *Donovan, supra,* to support his argument that an advertisement can constitute an offer. *Donovan* dealt with a mistake made in a newspaper advertisement regarding the price of a car. The newspaper printed the wrong, much lower, price, and a customer sued the dealer after the dealer refused to sell the car at that price. (*Donovan, supra,* 26 Cal.4th at pp. 267-269.)

The reason the newspaper price constituted an offer was that Vehicle Code section 11713.1, subdivision (e), prohibits a dealer from failing to honor an advertised price before the time specified in the advertisement has elapsed.[5] (*Donovan, supra,* 26 Cal.4th at p. 274.) There is no comparable statutory mandate at issue here.

Shenoi alleged no facts showing a specific offer by Cal-South to hold an investigation or the specific act that he performed in response to that offer. He does not allege that Cal-South approached him individually and offered to investigate claims if he would agree to be a referee. The court correctly sustained the demurrer to the implied contract cause of action.[6]

## B.          Promissory Estoppel

The elements of a cause of action for promissory estoppel are (1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310.) "A cause of action for promissory

---

[5]          Vehicle Code section 11713.1 provides: "It is a violation of this code for the holder of a dealer's license issued under this article to [¶] . . . [¶] . . . (e) Fail to sell a vehicle to a person at the advertised total price, exclusive of [identified taxes, fees, and charges] while the vehicle remains unsold, unless the advertisement states the advertised total price is good only for a specified time and the time has elapsed. Advertised vehicles shall be sold at or below the advertised total price, with statutorily permitted exclusions, regardless of whether the purchaser has knowledge of the advertised total price."

[6]          In his reply brief, Shenoi offers to amend the causes of action to which the demurrers were sustained. A plaintiff who wishes to amend after a demurrer has been sustained must explain to the reviewing court how the complaint could be amended to state a cause of action. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) Shenoi's proposed amendments deal only with his cause of action for breach of implied contract and do not overcome his failure to allege facts supporting a definite offer from Cal-South. He does not deal with amending the causes of action for promissory estoppel and fraud at all.

8

estopppel is a claim in equity that substitutes reliance on a promise for consideration "in the usual sense of something bargained for and given in exchange." (*Youngman v. Nevada Irrigation District* (1969) 70 Cal.2d 240, 249.) If actual consideration was given by the promisee, promissory estoppel does not apply. (*Id.* at p. 250; see *Raedeke v. Gibraltar Sav. & Loan Ass'n* (1974) 10 Cal.3d 665, 672-673; *Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1209; *Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 275, overruled on other grounds, *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919.)

On appeal, Shenoi maintains that he did provide actual consideration in reliance on Cal-South's promises: he "did become a referee – re-upping year after year." In fact, he alleged the identical consideration – enrolling in Cal-South's referee program and performing as a referee – that formed the consideration for his breach of contract action. Since he argues on appeal that he provided consideration for Cal-South's promise, he cannot state a cause of action for promissory estoppel.

In addition, the cause of action for promissory estoppel fails for the same reason that the contract cause of action fails – an insufficiently definite promise. A promise must be "clear and unambiguous in its terms." (*Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 890.) "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770.)

The "promise" Shenoi allegedly relied on, set out in footnote 4, *supra*, states a "policy" of Cal-South to investigate "valid claims of misconduct or conflict of interest by game officials." It then describes a process (filing of a formal complaint, gathering data from various sources) that culminates in a "review" and that "may" involve a hearing. The policy goes no further than that. It promises nothing.

9

A court would be hard-pressed to determine the scope of Cal-South's duty, to say nothing of a rational basis for the assessment of Shenoi's damages. The trial court properly sustained the demurrer to this cause of action.

### C.     Promissory Fraud

Civil Code section 1710 defines one species of deceit as "[a] promise, made without any intention of performing it." A cause of action for promissory fraud requires the plaintiff to allege that the promissor did not intend to perform at the time the promise was made, that the promise was intended to deceive and induce reliance, that it did induce reliance, and that this reliance resulted in damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 637; *Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1414-1415.) A plaintiff alleging fraud must plead the elements of the cause of action – including the allegedly fraudulent statements – with specificity. (*Goldrich v. Natural Y Surgical Specialties, Inc*. (1994) 25 Cal.App.4th 772, 782-783.)

Shenoi alleged the following "policy" as one of the promises that Cal-South had no intention of performing: "3.5.1.1. When any affiliated player, coach, manager, assistant coach, administrator, club/league official, game official, member, or any person reasonably construed as being associated with the team such as relatives and spectators who assaults or abuses a referee, the original jurisdiction to adjudicate the matter shall vest immediately in Cal South. [¶] 3.5.1.2. When an allegation of assault is verified by Cal South, the accused is automatically suspended until the alleged assault is adjudicated. [¶] 3.5.1.3. Cal South must hold a hearing within thirty (30) days of the assault or, if applicable the thirty (30) day period provided by subsection 3.5.2.3 of this section. If Cal South does not adjudicate the matter within that period of time, original jurisdiction shall immediately vest in the National Appeals Committee to adjudicate the matter, to which the same provisions as to the term of suspension shall apply." Shenoi also alleged a "Signature Rule" as being another fraudulent promise: "Any player, coach, administrator, parent or spectator promoting violence, enticing [*sic*] team dissent, or

10

generally in violation of sub-paragraph a (above) should be brought before the local hosting League/Club for possible disciplinary action (including suspension or removal of that player, coach, administrator, parent and spectators). Any appeals of local League/Club actions may be brought before the Signature League Circuit Director. Individuals may be subject to additional Cal South PAD Committee disciplinary action."[7]

According to Shenoi, Cal-South "did not intend to perform on its representations of investigation, resolution, and correction of abuse and misconduct toward referees[.]" Shenoi also alleged that, other than taking a recorded statement from him, Cal-South did nothing to fulfill its obligations.[8] He alleged only that his damages "are in an amount in excess of the jurisdictional limit of this Court."

The trial court sustained Cal-South's demurrer to this cause of action on the grounds that Shenoi had not stated facts showing intentional misrepresentations, reliance, or damages with specificity. On appeal, Shenoi argues that he stated facts sufficient to allege intentional misrepresentation (Civ. Code, § 1710, subd. (1)) and a promise made without intention to perform. (Civ. Code, § 1710, subd. (4).)[9]

The trial court correctly ruled that Shenoi failed to state his cause of action for promissory fraud with specificity. The conduct he alleged as the basis for his cause of action – telling someone at a soccer game that he smelled of alcohol or was under the influence of alcohol – did not constitute "assault" or "abuse" of a referee. Likewise, Shenoi alleged no instance of "promoting violence" or "enticing [*sic*: inciting?] team dissent" or violating an unidentified subparagraph, as stated in the alleged rule. Equally important, the language relied upon says a person violating this rule "should" be brought

---

[7] Shenoi alleged another code of conduct provision that describes the role of the soccer coach, but this provision does not promise to do anything.

[8] Shenoi also alleged that "Cal-South, through its attorneys, has misleadingly implied in Declarations that Cal-South has other policies and not the ones quoted above." It is unclear whether this allegation is intended as a further allegation of fraud. If it is, it cannot be the basis of a tort claim for fraud. (Civ. Code, § 47, subd. (b)(2).)

[9] Shenoi also argues that he stated a cause of action for fraud in contract formation. (Civ. Code, § 1572.) We have already determined that there was no contract between Shenoi and Cal-South.

11

before the league for "possible" disciplinary action and "may" be subject to further disciplinary action. There is simply no promise here.

Finally, as the court stated, Shenoi has failed to allege damages with specificity. A plaintiff "must suffer actual monetary loss to recover on a fraud claim." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240; see also *Hill v. Wrather* (1958) 158 Cal.App.2d 818, 825 ["Deception which does not cause loss is not a fraud in the legal sense."]; *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 888.) Shenoi did not specify any loss resulting from his reliance on Cal-South's promise or its allegedly fraudulent statement, let alone actual monetary loss. The trial court properly sustained the demurrer to this cause of action.

## II.        Rulings at Trial[10]

### A.            Per Se/Per Quod Defamation

Civil Code section 46 identifies five kinds of oral statements that qualify as slander: (1) a statement charging a person with a crime or having been indicted, convicted or punished for a crime; (2) a statement imputing the presence of an infectious, contagious, or loathsome disease; (3) a statement tending to injure one in one's office, profession, trade, or business in specified ways; (4) a statement imputing impotence or want of chastity; and (5) a statement that "by natural consequence" causes actual damage.

---

[10]        Shenoi's briefs repeatedly refer to trial exhibits that were not included in the appellant's appendix. California Rules of Court, rule 8.204(a)(1)(C) requires references to matters in the record to be accompanied by citations to the record.

Although California Rules of Court, rule 8.124(b)(4) provides that trial exhibits are deemed part of the record, if a party wishes to have trial exhibits included in the record on appeal, rule 8.224 sets out the procedure for transmitting trial exhibits to the reviewing court. Exhibits may also be included in the appendix, and respondents' appendix includes some, but not all, of the exhibits Shenoi cites.

Our review is limited to the record we have been provided. (*Sannmann v. Department of Justice* (2020) 47 Cal.App.5th 676, 684.) Thus we have ignored statements of fact in Shenoi's briefs unsupported by citations to matters in the record, including references to omitted exhibits.

It is the appellant's duty to give a complete record for our review. "Failure to provide an adequate record on an issue requires that the issue be resolved against plaintiff." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.) "Where exhibits are missing, we will not presume they would undermine the judgment." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291.)

The first four categories constitute slander per se. The plaintiff need not plead and prove actual damage. The last category is slander per quod. To recover under this theory, the plaintiff must plead and prove actual damage caused by the oral statement, which, in addition, must be false and unprivileged. (*Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, 367; Civ. Code, § 46.) Whether a statement is slanderous per se or per quod is a question for the court. (*Id.* at p. 368.)

Shenoi argues on appeal that the statement about his smelling of alcohol at the soccer game was slander per se and the court erred by refusing to instruct the jury accordingly. He asserts that accusing someone of being under the influence at a soccer game is a statement charging a person with a crime, citing Penal Code section 647.

Penal Code section 647 provides, "Except as provided in paragraph (5) of subdivision (b) and subdivision (k), every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] . . . [¶] (f) Who is found in any public place under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, controlled substance, or toluene, in a condition that they are unable to exercise care for their own safety or the safety of others, or by reason of being under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, or toluene, interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way."

To violate this code section, then, it is not sufficient to be drunk in public. A person must be under the influence of alcohol in public *and* either be unable to exercise care for his safety or for the safety of others or obstruct the public way. There is no evidence that Maya accused Shenoi of being unable to exercise care for his own safety or the safety of others or obstructed the public way. The only defamatory statements were

that Shenoi was under the influence and that he smelled of alcohol.  Being under the influence and smelling of alcohol are not, of themselves, crimes.[11]

Shenoi also argues on appeal that Maya's statements qualify as a statement tending to injure one in one's office, profession, trade, or business, his "office" being soccer referee.  "Soccer referee" is not an office.  An office is a position of authority in and duty to an organization, either public or private.  (See, e.g., *Correia v. Santos* (1961) 191 Cal.App.2d 844, 852-854 [slander not directed at plaintiff's occupation of radio broadcaster, but was directed at office of president of non-profit association]; *Jarman v. Rea* (1902) 137 Cal. 339, 344, overruled on other grounds *Snively v. Record Publishing Co.* (1921) 185 Cal. 565, disapproved on other grounds *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711 ["[W]ords imputing a want of integrity in any one holding an office of confidence or trust, whether an office of profit or not, are actionable *per se*."].)

The record indicates that this issue became quite muddled.  Shenoi filed jury instructions on defamation in May 2021 that included the element "That because of the facts and circumstances known to the listener(s)/reader(s) of the statements, they tended to injure Mr. Shenoi in his occupation or avocation . . . ."  The proposed instruction also stated, "If Mr. Shenoi has proved all of the above, then he is entitled to recover if he proves that [Defendants'] wrongful conduct was a substantial factor in causing any of the following actual damages:  [¶] a. Harm to Mr. Shenoi's occupation or avocation . . . ."

Civil Code section 46 does not include injury to an "avocation" among the elements of slander.  It specifies "office, profession, trade, or business," and restricts this injury to "imputing . . . general disqualification in those respects which the office or *other* occupation peculiarly requires . . ." or lessening their profits.  (Italics added.)  The

---

[11]    In his reply brief, Shenoi complains that Respondents are being too "punctilious" in referring to all the elements of Penal Code section 647, subdivision (f), in arguing that Maya did not accuse him of a crime.  Shenoi himself quoted the Penal Code section as the crime of which he had been accused.

statutory language includes "office" in the category of "occupation."  An avocation, or, as Shenoi himself described it, a "hobby" or a "passion," does not qualify as an occupation.[12]  (See, e.g.,  Elec. Code, §§ 4.48.210, subd. (3), 13107; Ins. Code, § 791.02, subd. (s); *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 471 [plaintiff not professional coach; statement "unfit to coach" not defamatory]; *Shephard v. Loyola Marymount Univ.* (2002) 102 Cal.App.4th 837, 845.)

Nevertheless, during the discussion of jury instructions and the verdict form, in December 2021, the term "avocation" began to surface.  Shenoi's counsel proposed that the court give an instruction on *both* slander per se and slander per quod.  Defendants protested that doing so would confuse the jury, and the court stated it needed to do some research.

The next court day, the day the case went to the jury, the court evidently handed a set of jury instructions to counsel.  A copy of this set is not in the record.  The instructions included one on slander per quod.  Shenoi argued at length that the slander was per se, but failed to convince the court.

Counsel then gave closing arguments.  The jury was dismissed from the morning session, and the court and counsel began to discuss the verdict form.  Shenoi argued again for the inclusion of "avocation" in the form.  Defendants noted that the language was taken directly from CACI verdict form No. 1705 for defamation per quod.  The court appears to have decided to use the CACI verdict form.

The defamation per quod instruction read to the jury stated as two of the elements Shenoi had to prove, "[B]ecause of the facts and circumstances known to the listeners of the statement, they tended to injure Mr. Shenoi in his occupation or avocation or expose him to hatred, contempt, ridicule, or shame or just to discourage others from

---

[12]     Shenoi's "trade or business" is an environmental decontamination business.

15

associating or dealing with him" and "Mr. Shenoi suffered harm to his occupation or avocation."

One of the questions on the verdict form, taken nearly verbatim from CACI, asked, "Did Mr. Shenoi suffer harm to his property, business, profession or occupation as a result of the statement(s)?" Avocation was not mentioned. The jury answered "No" to this question and thereby ended the case.

Including "avocation" in the jury instruction on defamation per quod was error, but the error was harmless because the jury determined Shenoi had not provided sufficient evidence of harm to his property, business, profession, or occupation. The statutory language – and consequently liability for speech without proof of actual damage – cannot be extended to include an injury to an avocation when the parameters have been so clearly defined. If the Legislature had meant to protect hobbies and pasttimes, it would have done so.

### B.        Punitive Damages

Civil Code section 3294, subdivision (a), provides, "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."[13]

Respondents moved for a directed verdict on, among other grounds, punitive damages, contending that Shenoi had not presented sufficient evidence to warrant a jury instruction on punitive damages. Although there is no record of a specific

---

[13]        Civil Code section 3294, subdivision (c), provides, "As used in this section, the following definitions shall apply: [¶](1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

16

ruling on this motion, the jury instructions did not include one on punitive damages, and the court indicated at the hearing on the motion that it did not think the evidence sufficient to go to the jury. On appeal, Shenoi argues that he did present sufficient evidence to go to the jury on punitive damages.

"A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.) The trial court resolves conflicts in the evidence against the moving defendant and gives to the plaintiff's evidence all the value to which it is legally entitled. The ultimate question is whether the plaintiff has presented sufficiently substantial evidence to support a verdict in his favor. (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750-751.)

A directed verdict and a nonsuit require the trial court to follow the same rules regarding how it considers the evidence. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.) "The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.]" (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)

We review directed verdicts de novo. (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 509.) Like the trial court, we view the evidence in the light most favorable to the plaintiff, and we draw all inferences in his favor, disregarding conflicting evidence. (*Guillory v. Hill* (2015) 233 Cal.App.4th

17

240, 249.)  There must, however, be substantial evidence to create a conflict for a jury's resolution.  (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)  A directed verdict is proper "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression."  (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 60-61.)

The trial court granted the directed verdict on punitive damages because "[w]e've got a person who made statements to and about a person he had never seen before and never since until this trial.  No reason to defame that person.  No personal circumstance that would lead him to be malicious or oppressive or otherwise desirous of doing harm to that person.  It just doesn't apply."  The court also noted that Shenoi's counsel had "shown some wisdom by not addressing it [i.e., punitive damages] this morning."

With respect to "malice," Shenoi has confused constitutional malice, or *New York Times* malice – the malice a public figure plaintiff must plead and prove to establish liability for defamation – with the malice required for punitive damages.  *New York Times* malice is actual falsity or reckless disregard of truth or falsity (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280.)  He has also confused punitive damages malice with the malice necessary to defeat the conditional privilege of Civil Code section 47, which is ill-will or lack of reasonable grounds for belief in the truth of the publication.  (See *Sanborn v. Chronicle Publishing Co*. (1976) 18 Cal.3d 406, 413.)

Punitive damages malice, by contrast, is either conduct intended to cause injury or despicable conduct coupled with a willful and conscious disregard of others' rights or safety.  (Civ. Code, § 3294, subd. (c)(1).)  In making its ruling, the court pointed to the undisputed fact that Shenoi and Maya had never met before the game, and Shenoi had produced no evidence of a "personal circumstance that would lead [Maya] to be malicious or oppressive or otherwise desirous of doing harm to [Shenoi]."  (See *College*

18

*Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725 ["'despicable'" means "'base,'" "'vile,'" or "'contemptible'" [Citation.]].)

Punitive damages for oppression likewise require clear and convincing evidence of "despicable" conduct, as well as evidence of cruel and unjust hardship and of conscious disregard for a person's rights. One of Shenoi's authorities on this issue is *Hoch v. Allied-Signal, Inc., supra,* in which the reviewing court *agreed* with the trial court that the plaintiff had not presented sufficient clear and convincing evidence of conscious disregard of the rights and safety of others to go to the jury on punitive damages for malice. (24 Cal.App.4th at p. 61.) Shenoi argues that the jury "fairly came to that conclusion," presumably that Maya "was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences," but he does not cite to anything in the record supporting this "conclusion" by the jury, which made no findings on punitive damages.

Shenoi's other authority is *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, in which the reviewing court *reversed* a punitive damages award against an insurance company because, while the company had lied and acted unfairly, "this conduct falls far short of subjecting [plaintiff] to 'cruel and unjust hardship in conscious disregard of [its] rights' or displaying a 'willful and conscious disregard of the rights . . . of others.'" Nor did the conduct, even though lacking in reasonable justification, qualify as "'despicable.'" (*Id.* at pp. 909-910.) Here, too, Shenoi has failed to identify conduct that subjected him to cruel and unjust hardship or that qualified as despicable.

Finally, Shenoi presented no clear and convincing evidence that Maya intentionally misrepresented Shenoi's state of sobriety or concealed anything about his state in order to deprive him of property or legal rights or otherwise cause injury. Although Shenoi alleged a scheme whereby Maya's team could somehow profit by his accusing the referee of being drunk if the team lost, there was no evidence at trial of any

19

such scheme.[14]  On the contrary, Maya made no effort to protest the outcome of the game or to agitate for a rematch.  And Shenoi does not explain why the coach of the winning team would join Maya in this scheme to overturn the result of the game.

We conclude that the court correctly granted the directed verdict on punitive damages.

### C.        "Guilty Mind" Jury Instruction

Shenoi asked the court to give CALCRIM No. 371.[15]  He claimed Maya got the coach of the opposing team to e-mail WCYS falsely accusing him of smelling of alcohol at half time, and that a WCYS officer participated in the conspiracy.

The basis of the "guilty mind" instruction is Shenoi's theory that Maya anticipated losing the December 12 game – his team had lost before to the opposing team – and resolved to manufacture a reason ("salt the mine") for protesting its outcome.  He hit on falsely accusing Shenoi, whom he had never met, of being under the influence of alcohol while refereeing the game as the pretext.  Maya then somehow persuaded the coach of the winning team, whom he likewise did not know, to join him in this effort by sending a voice mail and an e-mail to a WCYS officer also falsely accusing Shenoi of being under the influence and by repeating this story under oath in a deposition and at

---

[14]     This allegation got Shenoi past a motion to strike the punitive damages.  Shenoi raises it again on appeal but has never provided any facts to support it.

[15]      CALCRIM No. 371. "Consciousness of Guilt: Suppression and Fabrication of Evidence  [¶] If a defendant tried to hide evidence or discourage someone from testifying against him or it, that conduct may show that he or it was aware of his or its guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself.  [¶] If a defendant tried to create false evidence or obtain false testimony, that conduct may show that he or it was aware of his or its guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself.  [¶] If someone other than a defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his or its guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions.  It is up to you to decide the meaning and importance of this evidence.  However, evidence of such conduct cannot prove guilt by itself.  [¶] If you conclude that a defendant tried to hide evidence, discouraged someone from testifying, or authorized another person to hide evidence, you may consider that conduct only against that defendant.  You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

20

trial. Shenoi also implicated the WCYS officer in the scheme as well. Shenoi therefore asked the court for the CALCRIM jury instruction.

Shenoi proposed the instruction and argued for it on the day before the last day of trial. Defendants opposed giving an instruction designed for criminal cases in a civil case. The court stated it needed to do some research on this and other topics.

The following court day – the day the case went to the jury – the court handed out its packet of jury instructions; CALCRIM No. 371 was apparently not included in the packet. Shenoi presented some arguments on other instructions, but he made none on the absence of CALCRIM No. 371. The court included CACI No. 204, willful suppression of evidence, in the instructions read to the jury.

During the discussion of CALCRIM No. 371, Shenoi offered to substitute "liability" for guilt and to omit the part about "discourage someone from testifying about him or it,"[16] stating that this latter part "comes right out of a TV show on a drug case, and that certainly doesn't apply here[.]" He has not directed us to the portion of the record where he offered a specific instruction tailored to the circumstances of the trial with the changes he acknowledged were necessary. "In order to complain of failure to instruct on a particular issue the aggrieved party must request the specific proper instructions. [Citations.] It is the responsibility of counsel to propose correct instructions . . . ." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.)

In addition, Shenoi has not explained how the refusal to give the CALCRIM jury instruction prejudiced him. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [instructional error reversible only when it prejudicially affects

---

[16] Shenoi acknowledged that the word "guilt" in the instruction was inappropriate in a civil trial and offered to substitute "liability" instead. This would, we think, have created considerable jury confusion. A jury could easily understand the meaning of "consciousness of guilt," but would probably wonder what "consciousness of liability" meant. Was Maya supposed to have been conscious of publishing a false and unprivileged oral statement that charged Shenoi with a crime or tended to directly injure him in respect to his profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that had a natural tendency to lessen its profits, or that, by natural consequence, caused actual damage?

21

verdict].)  The jury found that Maya had no reasonable grounds for believing that Shenoi was under the influence of alcohol, that Maya's statement was a statement of fact, not an opinion, and that Maya failed to use reasonable care to determine its truth or falsity. Shenoi lost because he failed to persuade the jury that Maya's statements caused him to suffer harm in his property, business, profession, or occupation.  The presence or absence of guilt in Maya's mind has nothing to do with whether the statements harmed Shenoi's business.

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

GOETHALS, J.

22